IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTOINETTE EDDINS, )
)
Plaintiff, )
)  No. 15 C 8372
v. )
)  Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

In this Social Security appeal, plaintiff Antoinette Eddins seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") (doc. # 15). For the reasons set forth below, we grant Ms. Eddins' motion to remand and deny the Commissioner's motion to affirm (doc. # 25).

### I.

On January 27, 2012, Ms. Eddins filed for benefits alleging a disability onset date of October 1, 2006, later amended to May 16, 2009 (R. 23).[2] Her date last insured was December 31, 2012 (R. 16). She has not worked since 2007, when she was terminated from her job as a bus monitor after missing too much work (R. 43-44). After her claim was denied initially and on reconsideration, Ms. Eddins appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on November 8, 2013 (R. 36-63). The ALJ issued an opinion denying benefits on

---

[1]On October 21, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 8).

[2]On December 5, 2012, Ms. Eddins' attorney amended her alleged onset date to May 16, 2009 (R. 189). Ms. Eddins had previously applied for disability benefits on June 1, 2007, alleging an onset date of October 1, 2006 (R. 67). The Administrative Law Judge denied that application on May 15, 2009 (R. 64), and the Appeals Council denied Ms. Eddins' request for review of that decision (R. 82-90). Those decisions relate to Ms. Eddins' previous June 1, 2007 application for benefits and are not at issue in the current case.

February 20, 2014 (R. 13-30). On February 5, 2015, the Appeals Council denied Ms. Eddins' request for review (R. 7), making the ALJ's ruling the final decision of the Commissioner. *See Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

## II.

Ms. Eddins sought treatment for several different medical ailments. She visited her primary care physician, William Crevier M.D., in October and November 2009, who listed her diagnoses as major depression, panic attacks/panic disorder, asthma, fibromyalgia, tension headaches, and hyperthyroidism (R. 252-53, 515-16). Dr. Crevier prescribed medications including Ultram (a narcotic used to treat moderate to severe pain), Lyrica (used to treat nerve and muscle pain, including fibromyalgia), and Effexor (used to treat depression, generalized anxiety disorder, panic disorder, and social anxiety disorder) (*Id.*).

Ms. Eddins saw Jerry Coltro, M.D., a specialist in rheumatology, from January 28, 2007 through at least December 1, 2010. On December 1, 2010, Dr. Coltro filled out a fibromyalgia questionnaire. Although he checked the box stating that Ms. Eddins does not meet the American Rheumatological criteria for fibromyalgia, he noted that she was positive for pain in her upper and lower back, knees, ankles, feet, thoracic spine and chest, all of which improved with exercise and Effexor (R. 503-05). Dr. Coltro opined that Ms. Eddins' impairments lasted or could be expected to last at least 12 months, and that she is not a malingerer (R. 505). He opined that Ms. Eddins had the residual functional capacity ("RFC") to sit or stand only one hour continuously before she would need to stretch and exercise and could never lift or carry more than five pounds (R. 506-07). Dr. Coltro opined that Ms. Eddins was likely to have good days and bad days, and would likely to be absent from work more than three times per month (R. 507). Nevertheless, he noted that she was responding to treatment, and her prognosis was good (R. 503, 508).

2

Ms. Eddins saw a podiatrist from April 24, 2009 to November 15, 2010, who treated her for painful and abnormal gait caused by tarsal tunnel syndrome (compressed tibial nerve) and a heel spur (R. 274). In January and February 2011, Ms. Eddins received 14 sessions of physical therapy to address her pain and decreased range of motion and strength in her right ankle/foot, after which she still had moderate pain (R. 275-77). An X-ray of her ankle was unremarkable (R. 358), but an MRI on February 21, 2011 showed chronic sprains (R. 360).

Ms. Eddins also reported pain and intermittent numbness and tingling in her neck and right shoulder (R. 566). An MRI of Ms. Eddins' right shoulder on June 1, 2011, showed some partial tearing and mild narrowing (R. 288), but an X-ray of her cervical spine on July 25, 2011 was within normal limits (R. 564). On October 6, 2011, Ms. Eddins underwent right shoulder arthroscopy to repair her partial rotator cuff tear and right shoulder impingement (R. 291).

Ms. Eddins received individual mental health therapy from a social worker, Lamont Taylor, LCSW, approximately one to three times per month from at least May 2011 through October 2012. Mr. Taylor and Ms. Eddins often spent their sessions discussing her family and relationship stressors, particularly her sons (R. 378-80, 382-84, 386-88, 394, 396, 399, 454-55). In June and July 2011, Mr. Taylor noted that Ms. Eddins appeared depressed and complained of severe sleep trouble (R. 400-02). He was concerned by Ms. Eddins' negative self-talk and automatic thought distortions (R. 397-98). In September 2011, Mr. Taylor noted that Ms. Eddins was depressed due to her multiple medical problems, which she said caused her "unbearable pain" (R. 393). In October 2011, Ms. Eddins reported to Mr. Taylor that her mood improved with new medications prescribed by her psychiatrist Milton Daugherty, M.D., including Geodon (used for treating schizophrenia and bipolar disorder), Buproprion (anti-depressant), and Alprazolam (sedative used to treat anxiety and panic disorder) (R. 392). In March, May and June

3

2012, Ms. Eddins also reported that she was feeling less depressed due to medication and therapy (R. 377, 452-53).

On May 23, 2012, Christine C. Kieffer, Ph.D., a clinical psychologist, conducted a psychological examination of Ms. Eddins for the Bureau of Disability Determination Services ("DDS"). Ms. Eddins told Dr. Kieffer that she suffered from bipolar syndrome and panic disorder with agoraphobia, with symptoms including severe insomnia, social isolation, daily crying jags and auditory hallucinations (R. 406-07). Dr. Kieffer observed that Ms. Eddins was oriented to person, place and time, cooperative, responsive, socially appropriate and had a capacity for insight and social judgment within normal limits (R. 406). However, Dr. Kieffer found that Ms. Eddins' capacity for attention and concentration was "markedly impaired," as was her capacity for arithmetic calculation; she was able to repeat 4 digits forward and 3 digits backward but was unable to add, subtract or multiply (*Id.*). In addition, her fund of general information was "very poor," as she could not recount recent news events or differentiate between cities and states, though she was able to name the current U.S. President (*Id.*). Ms. Eddins' capacity for abstract conceptual reasoning was "somewhat impaired" because she was unable to interpret proverbs, but she was able to identify similarities between common objects (*Id.*).

On that same date, Liana G. Palacci, D.O., conducted an internal medical examination of Ms. Eddins for DDS. Ms. Eddins reported that she had been diagnosed with fibromyalgia four years earlier and that she suffered from generalized muscle aches, fatigue and insomnia (R. 410). Upon examination, Dr. Palacci observed that Ms. Eddins could heal-and-toe stand and knee squat, and that she had a non-antalgic gait with no assistive devices, normal strength in her upper and lower extremities, negative straight leg test, and normal range of motion everywhere, except

4

that she refused the lumbar range of motion testing due to pain (R. 411-12). Ms. Eddins had "exquisite tenderness on palpation" at 18 of 18 tender points, which was "consistent with fibromyalgia" (*Id.*). Dr. Palacci opined that Ms. Eddins' asthma was well-controlled, but that she had poorly controlled fibromyalgia (R. 412).

On June 18, 2012, state agency physician, Terry A. Travis, M.D., reviewed the medical record to determine Ms. Eddins' mental functional limitations (R. 416). Dr. Travis opined that Ms. Eddins had mild restriction in activities of daily living ("ADLs"); moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration (R. 426-27). On the RFC form Dr. Travis completed, he checked boxes indicating that Ms. Eddins was markedly limited in ability to understand, remember and carry out detailed instructions, and moderately limited in her ability to: (a) maintain attention and concentration for extended periods, (b) perform activities within a schedule, (c) maintain regular attendance, (d) work closely with others, (e) complete a normal work-day/workweek without interruptions from psychologically based symptoms, (f) perform at a consistent pace without an unreasonable number and length of rest periods, (g) interact appropriately with the general public, (h) get along with coworkers or peers, and (i) respond appropriately to changes in the work setting (R. 430-31). Dr. Travis found that Ms. Eddins was not significantly limited -- or there was no evidence of limitation -- in the remaining Paragraph B areas (*Id.*). Dr. Travis opined that Ms. Eddins was able to: "learn simple instructions," "function consistently at a reasonable rate within a schedule," "relate appropriately," adapt to circumstances," and complete "1-2 step tasks in a work setting that does not involve routine interaction with others" (R. 432).

On June 20, 2012 state agency physician Vidya Madala, M.D., reviewed the medical record to determine Ms. Eddins' physical functional limitations resulting from fibromyalgia and asthma (R. 435). Dr. Madala opined that Ms. Eddins should be limited to light work with an unlimited ability to push or pull, one postural limitation (occasionally balancing), and some environmental limitations (R. 435-38). Both Dr. Travis's and Dr. Madala's RFC assessments were affirmed by other agency consultants on reconsideration in October 2012 (R. 459-60).

On June 19, 2012, Mr. Taylor performed a mental status assessment of Ms. Eddins (R. 450). He found her to be cooperative, pleasant and responsive, oriented to person and place, and with good insight, judgment and normal affect (R. 450-51). However, on July 3, 2012, Mr. Taylor noted that Ms. Eddins recalled breaking into tears after going to a store (R. 449). On July 31, 2012, Mr. Taylor wrote that no progress was made towards some of the treatment goals he had established with Ms. Eddins, such as improving self-esteem and developing healthy relationships, and he spent the session addressing some immediate problems that Ms. Eddins was experiencing at that time (R. 444).

Although the record does not contain treatment notes from Ms. Eddins' treating psychiatrist, on May 30, 2013, Dr. Daugherty filled out a psychiatric/psychological impairment questionnaire based on his treatment of Ms. Eddins from May 26, 2011 to May 28, 2013 (R. 525). Dr. Daugherty listed Ms. Eddins' diagnoses as mood disorder due to multiple chronic medical problems and major depression, with a "guarded" prognosis (*Id.*). Though there were no laboratory or diagnostic tests to support the diagnoses, Dr. Daugherty indicated that the following clinical findings and symptoms supported the diagnoses: sleep disturbance, mood disturbance, depression, recurrent panic attacks, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or

isolation, and decreased energy (R. 526-27). Dr. Daugherty opined that Ms. Eddins was "moderately limited" in her ability to: (a) perform activities within a schedule, (b) maintain regular attendance and be punctual, (c) work in proximity with others without being a distraction, (d) interact appropriately with the general public, (e) accept instructions and respond appropriately to criticism from supervisors, and (f) respond appropriately to changes in work setting. He opined that Ms. Eddins had mild or no limitation in all other areas (R. 528-30). Dr. Daugherty listed Ms. Eddins' medications as Wellbutrin (buproprion, an antidepressant), Cymbalta (for depression, anxiety and fibromyalgia), and Doxepin (for depression, anxiety and sleep disorders) (R. 530). He opined that Ms. Eddins was capable of low stress work "at times," but her impairments were likely to cause good days and bad days, and she would not be able to tolerate work when she experienced anxiety and panic attacks (R. 531).

On November 13, 2013, Dr. Daugherty wrote a follow-up letter stating that Ms. Eddins "continues to have sleep and mood disturbances, recurrent panic attacks, difficulty thinking and or concentrating, as well as decreased energy and feelings of guilt/worthlessness," which symptoms "limit her social interactions and ability to perform daily living activities" (R. 624). Dr. Daugherty also relayed that Ms. Eddins reports that she has at least two days a week in which getting out of bed is challenging, and he opined that due to her chronic medical conditions, pain, and low self-esteem, she could easily decompensate during times of increased stress (*Id.*).

### III.

At the hearing on November 8, 2013, Ms. Eddins testified that she lived at home with her three sons, ages 10, 20 and 22 (R. 51). She testified that she suffered from a bad, constant throbbing through her shoulders, hands, back and legs, which she attributed to fibromyalgia (R. 45). In addition, she suffered from osteoarthritis, which gave her a continuous burning pain in

7

her knees, ankles and feet (R. 45-46). She suffered from asthma about twice daily, but she is able to control it with a nebulizer and rest (R. 46-47). Ms. Eddins took prescribed medication for her pain, which, along with heating pads and hot drinks, eased her pain somewhat (R. 53-54).

Ms. Eddins testified that she could not sit or stand for more than 40 minutes at a time because of her pain, and one to two times per week she suffered from panic attacks and spent the day in bed (R. 49-51). She was also depressed; she cried almost every day about bad things that happened to her (R. 51). Ms. Eddins could get herself ready in the morning, and about three times per week she folded clothes and cleaned and organized the house (R. 50). She drove to the store about 15 minutes away, sometimes by herself; she tried not to shop when there were a lot of people around (R. 51-52, 55). She also drove to visit her mother or her sister two to three times per month (R. 53). Ms. Eddins reads magazines and newspapers, but she has trouble following the articles and has to re-read things (*Id.*).

A Vocational Expert ("VE") also testified. The ALJ asked the VE to assume someone who could perform light or sedentary work with some environmental limitations, who was "limited to simple, routine, repetitive tasks with only occasional interaction with coworkers and supervisors[,] [a]nd no interaction with the public" (R. 56-58). The VE testified that there were a variety of unskilled jobs that person could perform (*Id.*).

### IV.

On February 20, 2014, the ALJ issued a written opinion finding Ms. Eddins not disabled and denying benefits (R. 30). The ALJ determined that Ms. Eddins had the following severe impairments: obesity, fibromyalgia, asthma, bipolar disorder, and panic disorder with agoraphobia (R. 18). The ALJ found that Ms. Eddins' history of right shoulder arthroscopy and rotator cuff repair was not severe because there was no objective evidence that it caused ongoing

problems (R. 18-19). In addition, the ALJ found that there was no objective evidence to support Ms. Eddins' allegations that she suffered from hearing loss, osteoarthritis and a heart disorder (R. 19). The ALJ determined that none of Ms. Eddins' impairments, alone or in combination, met or medically equaled a Listing (R. 19-20).

With regard to her mental impairments, the ALJ concluded that the Paragraph B criteria were not met (R. 20). Specifically, the ALJ determined that Ms. Eddins had only mild restriction in ADLs because she was able to care for her personal needs, "albeit at a slower rate of time," she "cares for third parties and a pet," and "she completes household chores (laundry, ironing, cleaning, and 'lite duty around the house as need')" (R. 20-21). In social functioning, the ALJ found that Ms. Eddins had moderate difficulties because her counseling records indicated that she had "difficulty interacting with her family," but she went out alone in the car or via public transportation to shop and spend time with family and friends and she had no problems with authority figures (R. 21). The ALJ determined that Ms. Eddins also had moderate difficulties in maintaining concentration, persistence or pace because she reported difficulty with memory, concentration, task completion and following written instructions, but she was able to read daily and follow spoken instructions well (*Id.*).

The ALJ stated that his determination of the Paragraph B criteria was consistent with Dr. Travis's assessment (R. 21-22). In addition, the ALJ stated that Ms. Eddins' "apparent unrestricted mental ability to operate a motor vehicle" undermined her claims that she was severely limited due to her mental disorders (*Id.*). He described driving as "a very dynamic" activity that required the making of "continuous" and "strategic decisions" about control and maneuvering (R. 21). The ALJ concluded that Ms. Eddins' ability to perform "such a complex task" indicated that she was not as limited by her mental impairments as she claimed (R. 21-22).

9

The ALJ next determined that Ms. Eddins had the RFC to perform light work, except she should avoid concentrated exposure to environmental irritants, and she was limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching or crawling, and she could never climb ropes, ladders or scaffolds (R. 22). The ALJ further limited Ms. Eddins "to simple, routine and repetitive tasks, she is never allowed to interact with the public, and she is limited to no more than occasional interaction with coworkers and supervisors" (*Id.*). The ALJ stated that this RFC was consistent with the assessments of the state agency consultants (R. 24).

The ALJ did not find Ms. Eddins' allegations to be "fully credible" because he found that her subjective complaints were inconsistent with some objective findings (R. 23-24). In addition, the ALJ compared the state agency psychiatric examination with the physical examination performed that same day, stating that Ms. Eddins knew the name of the current United States president and was able to perform simple arithmetic at one examination but not the other (R. 24). The ALJ concluded that this "large swing in cognitive behavior indicates symptom exaggeration or, at worst, intentional hindrance of the consultative exam" (*Id.*).

With regard to her physical impairments, the ALJ found that there was no objective evidence of fibromyalgia because examinations showed that Ms. Eddins did not have focal motor or neurological deficits or documented loss of motor or sensory skills, and she had normal gait and full range of motion (R. 24-25). Although Dr. Palacci opined that Ms. Eddins had poorly controlled fibromyalgia because she "displayed 'exquisite' tenderness on palpation of *all* tender points (18/18)" the ALJ determined that "the overall normalcy and benign nature" of Ms. Eddins' examination did not support greater RFC limitations (R. 25-26, emphasis in ALJ's opinion). In addition, the ALJ assigned "little weight" to Ms. Eddins' subjective complaints of pain because he found that her alleged limitations were "difficult to reconcile" with her reports

that she exercised and did yoga four times per week (R. 24). The ALJ also assigned "little weight" to the opinion of Dr. Coltro, Ms. Eddins' treating rheumatologist, because his opinion was based on her "subjective complaints and not documented objective signs or symptoms," and it was inconsistent with Ms. Eddins' exercising and lack of documented focal deficit (R. 29).

With regard to her psychiatric impairments, the ALJ noted that the record contained multiple psychiatric diagnoses from medical examinations in October and November 2009 through 2013 (R. 26). However, the ALJ discounted these diagnoses because they were based upon Ms. Eddins' subjective complaints, which he did not find fully credible, and "the record lack[ed] documented objective psychiatric symptomology or treatment" or examinations (*Id.*). The ALJ also stated that Ms. Eddins' mental health treatment was "extremely conservative in nature," because "other than prescribed medication," she had never needed emergency hospitalization and her individual treatment consisted primarily of "sporadic counseling visits with a social worker, whereat the claimant discusses her life stressors . . ." (*Id.*).

The ALJ found that Ms. Eddins' cooperative and socially appropriate behavior at Dr. Kieffer's examination "indicate[d] substantial ability as to her activities of daily living and her concentration, persistence and pace" (R. 26-27). The ALJ gave "little weight" to Dr. Kieffer's findings, including her determination that Ms. Eddins' "capacity for attention and concentration was markedly impaired, that her fund of information was very poor (such as the inability to name the current President), that she was poor as to arithmetic calculation . . . and that that she was impaired as to abstract thought" (R. 27). The ALJ stated that Dr. Kieffer's findings were "conspicuously inconsistent with the detailed notes from her State agency physical examination conducted that same day," where Ms. Eddins was, "other than tearfulness, [] without any indicia as to objective abnormal psychiatric symptomology" (*Id.*). The ALJ concluded that Dr. Kieffer's

11

findings and diagnoses were "based upon unreliable subjective complaints or observed psychiatric abnormality that is found to be substantially inconsistent with the weight of the record" (*Id.*).

By contrast, the ALJ afforded "significant weight" to the non-examining state agency RFC consultants. Regarding Ms. Eddins' mental health, Dr. Travis opined that Ms. Eddins "is able to learn simple instructions, that she is able to function consistently at a reasonable rate within a schedule, that she is able to relate appropriately, that she is able to adapt to circumstances, and that she is able to do 1-2 step tasks in a work setting that does not involve routine interaction with others" (R. 27). The ALJ stated that this RFC was supported by Ms. Eddins' conservative psychiatric treatment, lack of inpatient hospitalization, and lack of reliable documentation of significant psychiatric symptomology (R. 27-28). Physically, Dr. Madala opined that Ms. Eddins was capable of less than the full range of light work, with similar postural and environmental limitations to those the ALJ assessed (R. 28). The ALJ found this opinion supported because the record "fail[ed] to substantiate significant focal deficits" (R. 28).

The ALJ assigned "only partial weight" to the medical source statements of Dr. Daugherty, "a treating physician" (R. 28). The ALJ found Dr. Daugherty's opinion that Ms. Eddins had "more or less mild to moderate difficulty with . . . psychiatric cognitive ability" was inconsistent with his statement that Ms. Eddins' impairments "prevent her from functioning" (R. 28). The ALJ also found that much of Dr. Daugherty's opinion "appears to have been based upon the claimant's subjective reports," which the ALJ found less than reliable (R. 28-29).[3]

---

[3] Dr. Daugherty completed another questionnaire on June 19, 2014, adding marked limitations in ability to maintain attention and concentration for an extended period and understand and remember one or two step instructions (R. 630-32). This document was not before the ALJ, and it does not affect our determination here.

12

V.

We review the ALJ's decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alvarado v. Colvin*, 836 F.3d 744, 747 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). Ms. Eddins contends that the ALJ erred, among other things, in assessing her mental RFC. For the reasons set forth below, we conclude that remand is necessary on this basis, and we therefore do not reach Ms. Eddins' additional arguments for remand.

Ms. Eddins contends that the ALJ's determination of her mental RFC failed to account for her moderate limitations in concentration, persistence or pace (Pl.'s Br. at 9-11). The ALJ determined that Ms. Eddins had moderate difficulties in maintaining concentration, persistence or pace (R. 21), and as a result, limited Ms. Eddins' mental RFC to simple, routine and repetitive tasks, no interaction with the public, and occasional interaction with coworkers and supervisors (R. 22). We agree with Ms. Eddins that these limitations in the RFC do not adequately account for her mental limitations as determined by the ALJ.

It is well-settled that "the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (quoting *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014)). However, limiting Ms. Eddins to simple, routine and repetitive tasks, no interaction with the public, and occasional interaction

with coworkers and supervisors does not adequately account for her moderate limitations in maintaining concentration, persistence or pace. The Seventh Circuit has "repeatedly rejected the notion that . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Varga*, 794 F.3d at 813 (quoting *Yurt*, 758 F.3d at 858-50); *see also Taylor v. Colvin*, 829 F.3d 799, 801 (7th Cir. 2016) (same).

Dr. Travis -- whose opinion the ALJ found to be "supported by the weight of the record" (R. 28) -- opined that Ms. Eddins should be restricted to performing work involving only one-to-two step tasks due to her moderate limitations in concentration, persistence or pace. However, the ALJ, without even acknowledging the discrepancy, failed to account for that limitation in the RFC. This was error. In order to build the necessary "accurate and logical bridge between the evidence of mental impairments" and the RFC, the ALJ was "compelled . . . to account for" Ms. Eddins' documented limitations of concentration, persistence or pace and to account for Dr. Travis' opinion that she should be limited to one-to-two step tasks. *See O'Connor–Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016) (holding that the ALJ erred in failing to account for the claimant's documented limitations in concentration, persistence, and pace and in failing to address a doctor's opinion that she was moderately limited in responding appropriately to supervisors).

The ALJ's error here was not harmless. The ALJ did not ask the VE about a hypothetical individual limited to one-to-two step tasks, and the VE's opinion as to which jobs would be available to a person who could perform simple, routine, repetitive tasks was not limited to jobs containing only one-to-two step tasks. Thus, the ALJ's determination that a significant number

14

of jobs existed in the national economy for a person with Ms. Eddins' limitations was not supported by substantial evidence.

The Commissioner offers an extended -- but unpersuasive -- argument that this discrepancy does not matter (Def.'s Mem. at 4-8). The Commissioner acknowledges that the ALJ gave "significant weight" to the state agency psychological consultants whose opinions included a limitation to doing one-to-two step tasks (*Id.* at 4). However, the Commissioner argues that the ALJ did not err in omitting this limitation from Ms. Eddins' RFC because the ALJ was not required to "adopt every detail" of the mental RFC opinion, and the ALJ's opinion was nevertheless consistent with the opinions of the state agency consultants (*Id.* at 5). The Commissioner's argument fails for at least two reasons.

*First*, the Commissioner's argument that the ALJ's RFC opinion was consistent with Dr. Travis' opinion is a *post-hoc* rationale for the ALJ's decision to omit the one-to-two step limitation from the RFC. The ALJ never offered that rationale for his decision. It is well-settled that the Commissioner cannot now rely on a rationale that the ALJ did not rely upon in his opinion. *See Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)).

*Second*, the Commissioner's argument is an effort to cherry pick classifications in the Dictionary of Occupational Titles ("DOT"), to which VEs routinely resort in determining available jobs for a person with given limitations. The Commissioner contends that the ALJ's limitation to simple, routine, repetitive tasks and the state agency psychologists' opinion that Ms. Eddins can do one-to-two step tasks are consistent with each other because they fall within the "regulatory definition of unskilled work" (Def.'s Mem. at 6-8). However, we cannot assume that the one-to-two step limitation is meaningless to the VE unless the VE says so -- which did not

15

happen here. "Perhaps the vocational expert would have substantiated that speculation if asked, but, as before, the ALJ did not ask." *O'Connor-Spinner*, 832 F.3d at 698. This error requires remand.

## CONCLUSION

For the reasons stated above, we grant Ms. Eddins' motion to remand (doc. # 15) and deny the Commissioner's motion to affirm (doc. # 25).[4] The case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

/s/ Sidney I. Schenkier

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: November 16, 2016

---

[4] On remand, we invite the ALJ to revisit his analysis of the opinions of Dr. Kieffer and Dr. Daugherty, and his conclusion that Ms. Eddins' driving ability demonstrated that she had greater mental abilities than those doctors opined. In his written opinion as it now stands, the ALJ appears to have been "playing doctor . . . which an administrative law judge is not permitted to do . . ." *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014).

16